Filed 7/8/26  Marriage of Shakespeare CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of CARY and JAN E. SHAKESPEARE. | |
| CARY SHAKESPEARE, <br><br> Appellant, <br><br> v. <br><br> JAN E. SHAKESPEARE, <br><br> Appellant. | F087766 <br><br> (Super. Ct. No. BFL-17-003918) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Lisa M. Pacione, Judge.

Coleman & Horowitt, Stacy H. Bowman and Jennifer T. Poochigian for Appellant Jan E. Shakespeare.

Joel S. Seidel for Appellant Cary Shakespeare.

-ooOoo-

This appeal arises from a judgment dissolving the marriage of Jan Shakespeare (Jan) and Dr. Cary Shakespeare (Cary).[1] Each party alleges trial court error. Jan contends the trial court erred by: (1) allocating approximately $1.3 million to Cary as part of the community property equalization process; (2) failing to award the proper amount of mandatory damages for Cary's breaches of fiduciary duty; (3) failing to award sanctions under Family Code section 271;[2] and (4) failing to award Jan all of her need-based attorneys' fees. Cary contends the court erred by setting an amount for spousal support for Jan that leaves him impoverished.

We conclude the court erred in its treatment of a significant community asset. As a result of this error, we reverse the court's division of community property and award of permanent spousal support. We otherwise affirm the court's judgment and remand this matter for further proceedings.

## PROCEDURAL BACKGROUND

On September 19, 2017, Cary filed a petition for dissolution of marriage.

On September 26, 2018, the trial court appointed accountant James Braun to perform cash flow analyses and to evaluate Cary's interest in various medical business entities. The parties were ordered to cooperate with Braun, and Cary was directed to pay Braun's fees and expenses after the first $5,000. Braun's final report was to be admitted into evidence to help the court evaluate and divide the community interests in Cary's medical businesses and set permanent spousal support.

On April 9, 2019, a hearing on spousal support was held. Before the hearing, Jan learned that Cary might sell a medical corporation (MC) in which he had a significant ownership interest. Cary had not disclosed the likely sale to Jan or the court, so Jan

---

[1] Because the parties share the same last name, in order to avoid confusion, we refer to the parties by their first names. No disrespect is intended.

[2] All further statutory references are to the Family Code unless otherwise noted.

informed the trial court. The court ordered Jan and her counsel to be subject to the same sale confidentiality obligations as Cary, ordered Jan to sign a confidentiality agreement, and ordered Cary to produce all documents as they were signed and to provide details of the sale to Jan.

On July 10, 2019, Jan filed a motion to compel discovery responses, in which Jan sought Cary's responses to interrogatories and a request for production. As part of the motion, Jan requested $960 in attorneys' fees as a sanction.

On September 23, 2019, the trial court issued an order after hearing that sanctioned Cary $960 for failure to comply with Jan's discovery requests. The court also ordered Cary to produce all documents regarding the MC sale by September 10 or September 30, 2019 (depending on the signing date of a protective agreement), to produce other responsive discovery by September 30, 2019, and to place any funds received as part of the MC sale into a blocked interest-bearing trust account.

On December 10, 2019, a stipulated protective order was filed relating to the MC sale.

On May 15, 2020, Jan requested another order for Cary to produce the MC sale documents. She also sought sanctions of $75,000 in attorneys' fees under section 271 due to Cary's failure to produce the sale documents as required by prior court orders.

On July 21, 2020 (after a hearing on July 9, 2020), the trial court filed an order regarding spousal support and attorneys' fees. In part, the court ordered Cary to produce the MC sale documents. Cary complied with the court's instructions and provided the MC sale documents to Jan on July 14, 2020.

In March 2021, frustrated by Cary's degree of cooperation with Braun, Jan retained forensic accountant Jared Tonks to evaluate spousal support and assess and divide community assets and obligations. Tonks was tasked with creating a community and separate property balance sheet and performing an available income analysis,

3.

retroactive support calculations, a marital standard of living analysis, and a valuation of Cary's interests in various medical businesses.

In May 2021, the parties engaged in settlement efforts. At the end of negotiations, the parties believed a settlement had been reached. However, when provided a proposed stipulated judgment, Cary rejected the settlement.

In January 2022, the parties engaged in another settlement conference. At the end of the negotiations, again the parties believed that they had reached a settlement. However, the settlement impacted Cary's business partner, Dr. Armi Walker, who did not participate in the settlement. After reviewing the final documents, she and Cary both rejected the settlement.

On March 22, 2022, Jan filed a motion to compel production of documents formally requested on October 22, 2021, and a related request for sanctions/attorneys' fees.

On September 13, 2022, Cary filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of California.

On November 14, 2022, the court granted Jan's request for discovery sanctions and sanctioned Cary $16,829.

On March 7, 2023, Jan filed a request for order and sanctions. The request explained Cary had withdrawn $215,000 from a 401(k) account without notice. Jan sought the return of these funds and $8,234 in attorneys' fees.

In April, 2023, Jan filed her trial brief. In part, Jan sought attorneys' fees under section 271, permanent spousal support of $25,000 per month, an equalization payment of $827,319, and $3,048,143 for breach of fiduciary duty damages under section 1101, subdivision (h) (1101(h)).

From April 24 to April 27, 2023, and May 1 to May 5, 2023, the court conducted a trial concerning a final division of community assets and Jan's request for attorneys' fees and spousal support.

4.

On July 5, 2023, Jan filed her closing trial brief. In part, Jan requested a $927,319 equalization payment, $24,000 per month permanent spousal support, approximately $3 million under section 1101(h) for breach of fiduciary duty penalties, and the entirety of her attorneys' fees ($861,915) under section 271.

On October 12, 2023, the trial court issued a proposed statement of decision. In relevant part, the court explained the issues to be decided involved spousal support, the characterization and division of the community estate, and Jan's requests for sanctions and attorneys' fees under sections 1101 and 271. The proposed statement of decision awarded Jan $11,500 per month in permanent spousal support, $100,000 in attorneys' fees due to Cary's breaches of fiduciary duty, $168,000 in need-based attorneys' fees under section 2030, no sanctions under section 271, and an equalization payment of $645,724. The court also determined that the MC sale proceeds were a community asset to be split, along with associated tax liability, evenly between Jan and Cary.

On October 27, 2023, Jan filed objections to the proposed statement of decision. Jan objected that: (1) the equalization payment to her should be increased to $841,015 to correct a math error in the decision; (2) she should be awarded additional property to cover a $1.077 million shortfall in the blocked trust account; (3) the awards for breach of fiduciary duty attorneys' fees should be increased to comply with section 1101, subdivision (g) (1101(g)) and/or section 1101(h); and (4) section 271 sanctions should be awarded. Jan also asked the court to find that Cary lacked credibility and acted maliciously or fraudulently.

On November 1, 2023, Cary filed objections to the proposed statement of decision. In part, Cary objected that he could not afford to pay $11,500 per month in permanent spousal support. Cary also explained that he made an error in his trial brief when he suggested he pay Jan $10,758 of monthly permanent spousal support.

On November 16, 2023, the trial court issued its final statement of decision (FSD). The court addressed some of the objections by adding footnotes but otherwise adopted

5.

the findings and analyses of the proposed statement of decision. Significantly, the court did not: increase the equalization payment to Jan, change the Propertizer analysis, increase the awards for breaches of fiduciary duty, award sanctions under section 271, change the monthly permanent spousal support, increase attorneys' fees, or find that Cary lacked credibility or acted maliciously or fraudulently.

On January 16, 2024, a final judgment of dissolution was entered.

On January 29, 2024, Jan filed a combined notice of intention to move to set aside the judgment and motion to correct judgment for clerical error. The notice argued the court made mathematical errors, which led to a violation of section 1101(g), when it failed to provide for an equalization payment of $1.3 million.

On March 18, 2024, Jan filed a notice of appeal, and on March 21, 2024, Cary filed a notice of appeal.

On April 10, 2024, the trial court denied Jan's motion to set aside and correct.

## FACTUAL BACKGROUND

Jan and Cary were married for 29 years. At the time of trial in 2023, Cary was 60 years old, and Jan was 59 years old. Cary is a practicing obstetrician and gynecologist. Jan has a background in bookkeeping and accounting and supported Cary during medical school. After medical school, Cary and Jan had two sons and Jan stayed home to raise the children and manage the household. Cary and Jan's family enjoyed an upper income standard of living, which involved living near and having a membership in a country club, frequently eating out, and the provision of a separate residence for Cary's parents. Cary and Jan sent their sons to a private boarding school and later paid for their sons' tuition and living expenses during college. Both sons graduated from college in 2017.

Cary established a medical practice, Women's Care Center (WCC), in Bakersfield, along with Dr. Walker. WCC was Cary's primary source of income until November 2019, at which time he became a regional medical director for a health management

services organization.  Cary earns $325,000 per year in this position.  In the five years prior to separation, Cary earned on average $354,000 per year.

*Trial Testimony of Cary*

In relevant part, Cary testified his marriage had been deteriorating for many years. When he discussed separating from Jan, she said she would move away with the boys and make the divorce process very complicated and painful.

Cary testified that, as he was working in Bakersfield, he and other physicians invested in several medical entities.  Since the inception of these entities, he has acquired additional shares and increased his ownership interests.  Cary also established Cary Shakespeare, M.D., Inc., which he started in December 2017.  Cary Shakespeare, M.D., Inc. was formed because there was a possibility that a lawsuit involving WCC (as discussed below) would not go well, and Cary believed he may need an alternative for providing direct medical services to his patients.  However, Cary Shakespeare, M.D., Inc. does not have any operations and has never earned income.

Late in the marriage, WCC began to experience a significant drop in business. This was due to Dr. Walker being unable to deliver babies, declining reimbursements from Medi-Cal and Medicaid, and a very costly, and eventually unsuccessful, lawsuit against San Joaquin Community Hospital.  In fact, the lawsuit bankrupted WCC, and WCC was unable to maintain its financial obligations.  This caused Cary to provide his own funds to WCC, including $300,000 in 2018 and $200,000 in 2019.  The $300,000 was from a bonus given by MC at the end of 2017, and the $200,000 came from a distribution received in 2019 from the MC sale.  The financial status of WCC caused Cary to live paycheck to paycheck and meant that he was not always paid on a regular monthly basis from 2017 through 2019.  Cary stopped providing services to WCC in November 2019, when he became employed at the health management services organization.

Cary became the president of MC following the death of the incumbent president in July 2016. Cary remained president until 2018. In his capacity as president, Cary began negotiating the sale of MC in 2018. Prior to formal negotiations and communicating with MC's board, Cary had discussions in late 2017 with the ultimate buyer about the possibility of an MC sale. Cary broached the subject with the buyer because the buyer was in an "acquisition phase" and completing the purchase of another local medical entity. The buyer was interested in acquiring MC. As the discussions progressed, Cary as the president of MC signed a letter of intent to sell MC on February 6, 2018. An asset purchase agreement was executed on January 31, 2019, and the formal sale occurred on July 1, 2019.[3] Cary understood that the discussions involving the potential sale of MC, and the negotiations for the sale of MC, were all confidential and that he could not disclose to third parties anything regarding the sale.

Cary acknowledged that he received a large distribution in 2019 as part of the MC sale proceeds. Cary used that distribution in part to travel, buy designer clothing and sports memorabilia, make payments on large credit card debts, to help WCC (to help pay his salary) and his other medical entities financially, and to pay mortgage, family living expenses, legal fees, and spousal support. Additionally, in late 2019 after he had filed his 2018 tax returns, Cary received two federal tax form 1099s for the year 2018 that indicated Cary Shakespeare, M.D., Inc., had received $1 million from MC; Cary testified he did not actually receive those funds. Cary took the two 1099s to his accountant, Tim Hubbell, and asked him to investigate. After giving Hubbell the two 1099s, Cary's 2018 tax return was never amended.

Cary also testified to three settlement efforts. First, in December 2017, Cary gave Jan a letter and explained that he was about to get an unprecedented bonus from MC. Cary asked Jan to consult with her counsel to see if a settlement could be reached so that

---

[3] Due to this dissolution case, MC has not been fully wound down.

protracted litigation could be avoided. Cary did not propose any settlement figure or a lump sum spousal support buyout figure. Cary also did not give Jan any other document besides the letter and had no recollection of telling Jan to meet with Hubbell.

While unrepresented by counsel, Cary initiated a second settlement attempt in May 2021. Cary negotiated with Jan's counsel and believed that they had reached an agreement. During the negotiations, Cary said that tax liability was the main issue he had, and he wanted that paid for. Cary disclosed to Jan's counsel that he needed to get his tax liability and debts paid or else he would have no choice but to file for bankruptcy. Cary testified he does not have the ability to pay outstanding taxes owed for tax years 2019, 2020, and 2021. While Cary understood that they had agreed his tax liability would be taken care of because Jan would pay the taxes, the written agreement that Cary was given assigned all tax liability to him, which was unacceptable. Cary did not believe the formal proposed settlement agreement had merely corrected an error in the term sheet that was created during the negotiations.

Cary initiated and participated in a third settlement attempt in January 2022, but this time he was represented by his bankruptcy counsel. Although Dr. Walker was not part of the settlement negotiations, Jan required Dr. Walker to be a part of the settlement agreement. At the end of the day, Cary thought an agreement had been reached. Cary believed his tax liability would be paid and that $66,000 would be released for his bankruptcy attorney to attempt to settle with unsecured debtors. Cary owed approximately $600,000 in unsecured debts. The balance of the MC sale proceeds would go to Jan. Following the negotiations, the final settlement agreement proved unacceptable for several reasons, including the insertion of terms that were not actually agreed to during the settlement conference. In particular, a term was added that prevented Cary from filing for bankruptcy for five years. This was the only unacceptable term for Cary personally because he believed it was probable that he would need to file for bankruptcy protection.

9.

Finally, Cary acknowledged there were documents that he intentionally failed to disclose as part of the discovery process. Those documents pertained to the MC sale, but were eventually disclosed. Cary lost those documents in between private and professional moves, but once he was able to find them, he immediately provided them to his attorney for production. Other than the MC sale documents, Cary never intentionally withheld any documents from Jan, and he did his best to provide Jan with responsive information and documents.

*Trial Testimony of Jan*

In relevant part, Jan testified that she does not currently have a source of income, but prior to COVID restrictions, she worked at a juice bar and deli doing food preparation. One of her adult sons currently lives with her, and Jan explained that, while she does not have "typical days," she spends her time running errands, attending church, meeting with friends, or spending time with or caring for her mother who lives in Nevada. She currently lives in a smaller house with a smaller lot than the family home and tries to limit what she does and how often she eats out. Jan confirmed that until about the summer of 2020, Cary supported and paid the bills for her and their two sons.

Jan testified she was aware that there were taxes owed with respect to the MC sale proceeds in the blocked trust account, but she would not consent to the release of any of those funds to pay the taxes because Cary had not accurately reported community property. Jan believed the taxes should be paid from funds Cary failed to report. Jan confirmed she was asking the trial court to award her all of the funds in the frozen trust account, award her $3 million in breach of fiduciary duty damages, award her over $20,000 in monthly spousal support (even though she does not currently have monthly living expenses apart from attorneys' fees that exceed $20,000), and leave Cary to pay approximately $2 million in taxes and penalties on the MC sale proceeds.

Jan also testified that in December 2017, she received a letter from Cary that proposed a quick settlement. The letter explained that Cary was going to get a one-time

10.

bonus from MC. Cary wanted to see if they could come up with a total settlement amount and asked Jan to name a price/number. Jan said that another document came with the letter, and the other document contained numbers, valuations, assets, and liabilities. Jan understood that Cary was suggesting a lump sum settlement of $400,000 and no spousal support. Jan responded that she needed more information, and Cary arranged for her to see Hubbell. Jan testified she subsequently met with Hubbell for about a half-hour. Jan showed Hubble the letter Cary had given her, as well as the document that listed assets, liabilities, and valuations. Hubbell told her that settling for about $400,000 and no spousal support was a reasonable deal. When Jan asked Hubbell about placing a present value on possible spousal support, he refused to do so. After meeting with Hubbell, Jan told Cary she needed more documentation, and Cary responded by pressing her for a single one-time sum to settle the divorce. Jan never gave Cary a number to settle the divorce. At trial, Jan no longer had the document with the $400,000 figure or the assets, liabilities, and valuations.

Finally, Jan testified the first time she heard of the MC sale was in spring 2019. Jan heard from a third party that the sale would be happening. Jan, through her attorney, then informed the trial court of the pending sale in April 2019. Despite several court orders starting in April 2019, it was not until July 14, 2020, that she received the MC sale documents.

*Trial Testimony of Tim Hubbell*

In relevant part, Hubbell testified he has been a certified public accountant since 1993. Hubbell prepared tax returns for Jan and Cary for about 15 years and also prepared tax returns for several of the medical entities in which Cary had an ownership interest. Hubbell discussed the 2018 tax return he had prepared for Cary, and the 2017 and 2018 tax returns he had prepared for Cary Shakespeare, M.D., Inc. In 2017 and 2018, Cary Shakespeare, M.D., Inc. had "no-activity returns" and paid only the $800 minimum franchise tax fee because that entity was essentially inactive. With respect to the two

11.

1099 forms issued to Cary Shakespeare, M.D., Inc. for the tax year 2018 (but that were actually issued late in 2019), Hubbell spoke with Cary, did some investigation, essentially determined that the two 1099 forms from MC had been issued in error, and did not amend Cary's 2018 tax return.

Hubbell also discussed Jan and Cary's tax return for 2019. Hubbell confirmed that Jan refused to sign a proposed joint tax return. Jan did not sign the return in part because Cary had not reported a $1 million payment as part of the MC sale (specifically as part of a non-compete clause). Jan also did not want to sign because, although taxes on the MC sale proceeds were owed, Jan believed it was not fair for her to pay taxes on funds received by Cary. Ultimately, Hubbell revised the 2019 tax return to include the additional $1 million, but it appears Jan and Cary filed separate returns. Hubbell testified he had no reason to believe that Cary had been misrepresenting his income for 2019, no tax documents would have been issued for the $1 million non-compete payment, and that it was possible that there was a disconnect with Cary in terms of providing appropriate information.

With respect to paying taxes on the MC sale proceeds, Hubbell communicated with Jan's counsel again in May 2021. No agreement regarding the payment of taxes was reached because Jan believed Cary had enough funds to pay the taxes. No taxes were paid on the MC sale proceeds, and penalties and interest continued to accrue. These penalties and interest would be less if the taxes or a portion of them had been paid in advance. At the time of Hubbell's testimony, Cary owed taxes for 2019, 2020, and 2021.

Finally, Hubbell had no recollection of meeting with Jan in December 2017 or of reviewing documents summarizing Cary's business interests and the value of Cary and Jan's community estate. Hubbell also had no recollection of recommending that Jan accept a $400,000 settlement offer.

12.

*Trial Testimony of Leonard Welsh*

Leonard Welsh was Cary's bankruptcy attorney who participated in the final settlement conference in January 2022. Welsh testified that Cary's tax liability was a critical component of the settlement negotiations, and that Cary's two primary goals were to ensure all of his tax liability would be paid and that there would be sufficient funds to pay or satisfy his unsecured creditors. After the conclusion of the settlement negotiations, there was a settlement in concept that was in place. However, Welsh was not clear whether there was a complete meeting of the minds with respect to Cary's tax liability. Welsh and Cary had agreed that if sufficient funds could not be obtained, Cary would have to file for bankruptcy. Further, Dr. Walker was not present at the January 2022 settlement negotiation, but Welsh knew Dr. Walker and advised her of the settlement terms that would affect her property interests. Because Dr. Walker was not present during the negotiations, it was understood she would have to agree to those terms.

After the settlement conference, Jan's counsel prepared a draft settlement agreement. When Welsh received the draft, he then began representing Dr. Walker. Dr. Walker disagreed with two provisions—the sale of an Oceanside property that was owned by Dr. Walker and Cary's LLC and a release of liability by Dr. Walker for any claims she may have against Cary, Jan, and Jan's counsel. Welsh subsequently informed Jan that the settlement was unacceptable.

Welsh initially did not remember any discussions regarding a five-year prohibition against Cary filing bankruptcy but did recall that a primary goal was to have sufficient funds to satisfy creditors and thus, avoid bankruptcy. Welsh later testified that he recalled a five-year bankruptcy prohibition was discussed in the morning session, but it was also "very clear" that in order to agree not to file for bankruptcy, there would have to be sufficient money to satisfy the unsecured debt. Welsh was "confident" that he would be able to settle the unsecured debt with $66,000, but he did not guarantee or give any assurance that he would be able to do so.

I.      **Application of Section 1101 to the Proceeds from the MC Sale**

      A.      **Parties' Arguments**

Jan argues a clerical error appears on the face of the judgment. Jan contends the FSD made clear the MC sale proceeds are community property that are to be divided equally, with each party to be charged for any pretrial distributions from those proceeds. She notes that even though the judgment and the FSD recognized Cary received an additional $1,294,096 in sale proceeds pretrial, this amount was not included in the trial court's Propertizer. Specifically, Jan points out the court did not clearly credit Cary for a 2019 pre-sale distribution of $1,037,688, $188,408 received in 2022, and $68,000 to be received in 2023. If these funds totaling $1,294,096 are added to the Propertizer as Cary's property, Jan argues she is entitled to an additional $645,724 as an equalization payment. Additionally, and relatedly, Jan contends the court correctly found a breach of fiduciary duty under section 1101 when Cary failed to disclose this $1,037,688 MC pre-sale distribution. However, Jan argues the court erred by not awarding her 50 percent of the $1,037,688 as required by section 1101(g).[4] Jan further contends that, irrespective of section 1101(g), Cary's discovery and settlement conduct demonstrate malice and fraud and thus, the court should have awarded her 100 percent of these undisclosed funds under section 1101(h).

Cary maintains there was no clerical error because the trial court heard and effectively overruled Jan's similar objections to the proposed settlement when it made no change to the Propertizer or its division of community assets. Cary in part also argues the court correctly divided the community estate largely in accordance with the method in Tonks's final report. Cary avers that when certain changes are made in Tonks's report so

---

[4]     Jan makes related arguments regarding attorneys' fees under section 1101(g). We address those arguments in a separate section of this order.

that it aligns with the court's Propertizer, the Propertizer and Tonks's community division are essentially the same because they are only off by $10,000.

### B. Additional Background

As part of the FSD, the trial court addressed the proceeds from the MC sale. Cary's share of the total sale price was $5,011,205 and was to be paid through installments. The installments were identified as follows: (1) 2019—$1,037,688 (paid to Cary prior to the July 1, 2019 sale); (2) 2019—$1 million (paid directly to Cary as part of a covenant not to compete); (3) 2020—$1,437,559; (4) 2021—$1,279,550; (5) 2022—$188,408; and (6) 2023—$68,000 (to be paid after issuance of the FSD) (These numbers differ from the total sale price by $280). The court determined the sale of MC was a sale of a community asset and thus, Cary's share of the sale proceeds was a community asset that must be divided equally.

The court also recognized Jan and Cary had received pre-trial distributions from the sale proceeds and that each party was to be "charged with the amounts received prior to trial." The FSD specifically identified the following pre-trial distributions: (1) January 2019—$259,418 as a loan repayment for Cary; (2) July 2020—$150,000 to Jan for attorneys' fees, $50,000 directly to Jan, and $50,000 to Cary for attorneys' fees; and (3) December 2020—$50,000 as a joint expense for Braun's fees and $500,000 directly to Jan as a general pre-distribution. As part of a footnote, the court also cited that Cary received (sometime in 2019) $1,037,688 prior to the actual July 1, 2019 sale. The court noted that $2,930,365 of the $5.011 million sale proceeds remained deposited in blocked accounts. The $2,930,365 consists primarily of the MC sale proceeds that were distributed in 2020 and 2021 and the second distribution in 2019.

The trial court's FSD included a Propertizer form. The Propertizer contains the following relevant line items and amounts: (1) Line Item 1, "[MC] sale[] proceeds" of $2,505,603 for Cary and $2,505,602 for Jan; (2) Line Item 2, "Tax liabilities associated with [MC] sale proceeds" of $1,136,252 to both Cary and Jan; (3) Line Item 19,

"Predistribution for attorney[s'] fees" of $150,000 to Jan; (4) Line Item 20, "Predistribution for attorney[s'] fees" of $50,000 to Cary; (5) Line Item 21, "Predistribution 7-21-20" of $50,000 to Jan; (6) Line Item 22, "Predistribution 12-29-20" of $500,000 to Jan; (7) Line Item 23, "Joint expert fees" of $25,000 to Jan and $25,000 to Cary; and (8) Item 24, "[MC] loan repayment" of $259,418 to Cary. All of these line items were listed as positive numbers; none were listed as negative numbers, indicating a sum deduction from a party's allocation. Further, the Propertizer does not have specific line items for the $1,037,688 received by Cary prior to July 1, 2019, the $188,408 he received in 2022, or the $68,000 he was expected to receive in 2023. The net effect of the Propertizer was that Cary owed Jan an equalization payment of $645,724.

The FSD also identified three instances where Cary breached his fiduciary duty to Jan.[5] First, in January 2019, when Cary liquidated a community whole life insurance policy without Jan's knowledge or consent and deposited the $100,000 proceeds in his own bank account, the court found that he violated the standard family law restraining order and his fiduciary duty to Jan.

Second, Cary violated his fiduciary duty to Jan by not timely disclosing the MC sale. In early February 2018, seven months after he and Jan separated, Cary executed a letter of intent to sell MC as MC's CEO. Six months after executing the letter of intent, in August 2018, he served Jan with his preliminary declaration of disclosure and represented that " '[a]s far as [he was] aware the parties have not been presented with any investment, business or other income-producing opportunities since the date of

---

[5]     The trial court also found Cary did not breach any fiduciary duty to Jan with respect to two other transactions, a $200,000 loan against the family home and the receipt of about $1 million in 2018 as dividends from MC. With respect to the loan, the court found Jan had co-signed for the loan and that Cary used the funds for appropriate community purposes. With respect to the $1 million, the court determined that, considering Hubbell's testimony, and despite Cary receiving two 1099s in late 2019, Cary did not actually receive these funds and thus, did nothing improper.

separation.' " The trial court found this representation was clearly contrary to the facts known to Cary as MC's CEO.

Not until April 2019 did Jan learn that the sale of MC was in process. Through counsel, she brought the sale to the court's attention at the April 9, 2019, hearing. That day the court issued an order granting Jan access to the sale documents provided she was subject to any non-disclosure agreement requested by MC. By that time, however, Cary had already received and dissipated a large portion of the sale proceeds without any disclosure to Jan. Cary conceded in his closing brief that he " 'spent unreasonably, like a kid in a candy store.' " As a result, only a portion of the sale proceeds were placed in a blocked account subject to withdrawal on court order.

Moreover, the actual sale documents were not provided to Jan until July 14, 2020, after repeated requests, including Jan's motion to compel discovery responses filed on July 10, 2019, and a request for order seeking production of the sale documents filed on May 15, 2020. The trial court noted that the sale documents were not fully produced by a September 2019 deadline that was judicially set as a result of the July 10, 2019, motion to compel.

The sale was ultimately consummated on July 1, 2019, with Cary receiving $5,011,285 or 21 percent of those proceeds. He does not dispute that the sale proceeds are community property. Noting Cary had a fundamental duty to advise Jan that the sale was pending, the court found that Cary breached his fiduciary duty to Jan by failing to disclose the sale of MC, a significantly valuable community asset. It was only through a source other than Cary that Jan learned of the sale. The court found no indication that but for Jan's fortuitous discovery Cary's sale of MC ever would have been discovered.

Finally, the court ruled Cary violated his fiduciary duty to Jan by withdrawing $215,000 from a community 401(k) account. In February 2023, Cary advised Jan's

17.

counsel that he had withdrawn that sum to pay his attorneys' fees and costs, estimated early withdrawal taxes, bankruptcy counsel's fees, and $16,828.61 discovery sanctions. The court remarked that section 2040, subdivision (a)(2)(B) of the standard family restraining order allows for a party to retain counsel, but that statute does not contemplate the use of community funds to pay counsel in other proceedings, here his bankruptcy counsel, nor his court-imposed sanctions. The court found the withdrawal of the funds from the 401(k) account were a violation of the provisions of section 2040 and entitled Jan to an award of attorneys' fees.

### C. Legal Standard

California recognizes that the confidential relationship between spouses is a fiduciary relationship. (§ 721, subd. (b); *In re Marriage of DeSouza* (2020) 54 Cal.App.5th 25, 31–32; *In re Marriage of Schleich* (2017) 8 Cal.App.5th 267, 276 (*Schleich*).) As a result, spouses owe each other a fiduciary duty with respect to their marital community property, which includes a duty to properly manage community assets and to disclose the existence, characterization, and valuation of community assets and liabilities. (§ 1100, subd. (e); *DeSouza*, at p. 32; *Schleich*, at pp. 276–277.) Spouses continue to owe each other fiduciary duties with respect to community assets and liabilities during a marital dissolution proceeding, including the duty to accurately and completely disclose all such assets and liabilities. (§ 2102, subd. (a); *DeSouza*, at pp. 32–33; *Schleich*, at pp. 277–278.)

A spouse may bring a claim for breach of fiduciary duty against the other spouse where the breach of fiduciary duty "results in impairment to the claimant spouse's present undivided one-half interest in the community estate …." (§ 1101, subd. (a); *In re Marriage of Wiese* (2024) 102 Cal.App.5th 917, 931 (*Wiese*); *Schleich*, *supra*, 8 Cal.App.5th at p. 277.) For breaches of fiduciary duty that do not involve "oppression, fraud, or malice" under Civil Code section 3294 (*Weise*, at p. 932), the remedies available to the claimant spouse "shall include, but not be limited to, an award … of 50 percent, or

an amount equal to 50 percent, of any asset undisclosed or transferred … plus attorney's fees and court costs." (§ 1101(g); *Weise*, at p. 932; *In re Marriage of Hokanson* (1998) 68 Cal.App.4th 987, 992.) Because awards under section 1101(g) "are meant to restore to the aggrieved spouse [their] lost value in [the] community [asset]," " 'the 50 percent interest awarded under [section 1101(g)] must be the same 50 percent that would be awarded in the overall division of community assets.' " (*In re Marriage of DeBenedetti & Ensberg* (2025) 110 Cal.App.5th 1035, 1044; see *Schleich*, at pp. 286–287.) The specifically identified remedies within section 1101(g) are mandatory, not discretionary. (*In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1270 (*Prentis-Margulis*); *Hokanson*, at pp. 992–993.)

For breaches of fiduciary duty that involve "oppression, fraud, or malice" under Civil Code section 3294 (*Wiese*, *supra*, 102 Cal.App.5th at p. 932), the remedies available to the claimant spouse "shall include, but not be limited to, an award … of 100 percent, or an amount equal to 100 percent, of any asset undisclosed or transferred in breach of the fiduciary duty." (§ 1101(h); *Wiese*, at p. 932; *In re Marriage of Gilbert-Valencia & McEachen* (2023) 98 Cal.App.5th 520, 527.) In order to obtain 100 percent of an undisclosed asset, the claimant spouse must demonstrate by clear and convincing evidence that the breaching spouse acted with "oppression, fraud, or malice." (See *Gilbert-Valencia & McEachen*, at p. 527; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2025) ¶ 8:624, p. 248 (Hogoboom); see *Prentis-Margulis*, *supra*, 198 Cal.App.4th at p. 1270.) "Malice" under Civil Code section 3294 means "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1); see *College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 725.) The adjudicative "despicable" is "a powerful term that refers to circumstances that are 'base,' 'vile,' or 'contemptible.' " (*College Hospital*, at p. 725.) "Fraud" under Civil Code section 3294 means "an

intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c)(3).) The specifically identified remedy within section 1101(h) is mandatory, not discretionary. (*Prentis-Margulis*, at p. 1270.)

A spouse's breach of fiduciary duty claims are generally reviewed under the abuse of discretion standard. (*In re Marriage of DeSouza*, *supra*, 54 Cal.App.5th at p. 33.) A trial court may abuse its discretion through an erroneous understanding of applicable law or grounding its decision on improper criteria. (*Hardy v. Forest River, Inc.* (2025) 108 Cal.App.5th 450, 456; *In re Marriage of Mullonkal & Kodiyamplakkil* (2020) 51 Cal.App.5th 604, 618.) The court's factual findings are reviewed for substantial evidence, either contradicted or uncontradicted. (*DeSouza*, at p. 33.) The judgment or order of the trial court is presumed correct, and all intendments and presumptions are indulged in favor of correctness. (*Schleich*, *supra*, 8 Cal.App.5th at p. 276.) This includes resolving any ambiguities or inconsistencies in the record or in the judgment or order in a manner that sustains the judgment or order. (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1069 (*Eli B.*); *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631 (*Winograd*).) Further, the trial court's credibility determinations are binding and conclusive on appeal. (*In re Marriage of Berman* (2017) 15 Cal.App.5th 914, 920; *In re Marriage of Boswell* (2014) 225 Cal.App.4th 1172, 1175 (*Boswell*).) If omissions or ambiguities in a trial court's statement of decision are not brought to the court's attention, appellate courts will imply findings in support of the decision. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133; *In re Marriage of Furie* (2017) 16 Cal.App.5th 816, 827.) Ultimately, a trial court's order will be reversed if, after considering all of the evidence in the light most favorable to the order, and indulging all reasonable inferences in the order's favor, no judge could have reasonably made the order. (*Menezes v. McDaniel* (2019) 44 Cal.App.5th 340, 347.)

However, where the trier of fact has expressly or implicitly concluded that the appellant did not carry her burden of proof, the question on appeal becomes whether the evidence compels a finding in favor of the appellant as a matter of law. (*In re Marriage of Diamond* (2024) 106 Cal.App.5th 550, 566 (*Diamond*); *Jones v. Solgen Construction, LLC* (2024) 99 Cal.App.5th 1178, 1195–1196 (*Jones*).) This question is determined by asking whether the appellant's evidence was " 'uncontradicted and unimpeached' " and " 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Diamond*, at p. 566; *Jones*, at p. 1196.) In the absence of a specific finding to the contrary, appellate courts presume the trial court found the appellant's evidence lacked sufficient weight and credibility to carry the burden of proof. (*Diamond*, at p. 567; *Jones*, at p. 1196.)

D.      **Analysis**

1.      **Effect of Failing to Disclose the Sale of MC**

The parties dispute the effect of the trial court's MC sale breach of fiduciary duty finding on the court's final division of community property. Jan contends the court erred by failing to award her half of roughly $1.3 million, which was received by Cary without any notice to her, as required by section 1101(g). For his part, Cary seems to argue there is no error because the court's calculations and division of property essentially align with Tonks's analysis, once certain erroneous matters are corrected from his report. Considering the court's findings, we do not completely agree with either party.

As noted above, the trial court did not find that Cary breached his fiduciary duty by failing to disclose any post-sale or pre-sale *disbursements* relating to MC. That is, the court made no finding that the $1.037 million received by Cary prior to July 2019, or the $188,000 received by Cary in 2022, or the estimated $68,000 Cary was to receive in

21.

2023[6] were the specific community assets that were the subject of Cary's breach of fiduciary duty. Instead, the court found Cary breached his fiduciary duty to Jan when he failed to disclose in his August 2018 preliminary declaration of disclosure that *the sale* of MC would be taking place.

Specifically, the court explained that Cary had a "fundamental obligation … to first advise [Jan] that *the sale* was going to be taking place" and that the "fundamental issue here [was] the breach of fiduciary duty by [Cary] by failing to disclose *the sale* of a significantly valuable community asset." (Italics added.) As the FSD recognized, the failure to disclose the sale of MC to Jan was a breach of fiduciary duty because Cary's ownership interest in MC was a community asset. As a result, because Cary's ownership interest in MC was a community asset, and because Cary failed to disclose the sale of MC, the community asset that is subject to division through section 1101(g) is the entire $5.011 million that Cary was to receive as a result of the sale, it is not a specific portion or portions of the $5.011 million.

Section 1101 is intended to preserve each spouse's one-half interest in community assets and the community estate. (See *In re Marriage of DeBenedetti & Ensberg*, *supra*, 110 Cal.App.5th at p. 1044; *Schleich*, *supra*, 8 Cal.App.5th at p. 286.) As such, part of the remedy for a violation of section 1101 is in the nature of disgorgement and reclamation from the breaching spouse to the harmed spouse. (See *DeBenedetti & Ensberg*, at p. 1044; *Schleich*, at p. 286.) "[T]he 50 percent interest awarded under [section 1101(g)] must be the same 50 percent interest that would be awarded in the overall division of community assets." (*DeBenedetti & Ensberg*, at p. 1044; *Schleich*, at pp. 286–287.) The awarded 50 percent of an asset is "not in addition to the return of the claimant spouse's one-half interest in the property." (*Weise*, *supra*, 102 Cal.App.5th at

---

6     The trial court did find, however, that these amounts were part of the total $5.011 that Cary was to receive as part of the MC sale.

p. 935; see *Schleich*, at p. 287; Hogoboom, *supra*, at ¶ 8:617, p. 244 .)  That is, the remedy provided under section 1101(g) is the 50 percent interest (and attorneys' fees); "[i]t is *not* in addition to an equal share of the same asset as part of the property division." (Hogoboom, *supra*, at ¶ 8:617, p. 244 ; see *Schleich*, at pp. 273, 287 ["The alternative 'amount equal to' remedy under [section 1101(g)] should be interpreted to achieve the same result as an award of one half the asset itself…. [Where a breaching spouse is awarded an amount equal to 50 percent of the value,] the breaching spouse would retain the asset as separate property, the claimant spouse would receive an award equivalent to his or her community interest in the asset, and there would be no community asset to divide upon dissolution."].)  Therefore, "[a]fter a claimant is awarded his or her interest in an asset under [section 1101(g)], there is no longer an asset to divide in the dissolution proceedings." (*Schleich*, at p. 287; Hogoboom, *supra*, at ¶ 8:617, p. 244.)

In light of these principles, the entire $5.011 million must be allocated through section 1101(g) equally between Jan and Cary, but separately from the division of the remainder of the community estate.  (See *Schleich, supra*, 8 Cal.App.5th at pp. 273, 286–287; Hogoboom, *supra*, at ¶ 8.617, p. 244.)  Because tax liability has attached to and is inextricably intertwined with the $5.011 million community asset, it is appropriate to assign the parties' tax liability through a section 1101(g) division.

The section 1101(g) division should take into account all monies that were distributed from the MC sale proceeds in accordance with a court order, the loan paid off on behalf of Cary, and any funds received by Cary as MC sale proceeds that were not deposited by him into the blocked trust account.  In other words, any pre-FSD distributions of MC sale proceeds, by court order or otherwise, should be recognized and credited to the receiving party as part of the section 1101(g) process.  Such credit recognizes the simple fact that a party has already received a portion of the MC sale proceeds.  By considering each of these sums, it can be determined what remaining proceeds in the blocked trust account each party is actually entitled to receive through

23.

section 1101(g). If a spouse has received more than their equal share of the divided $5.011 million MC sale proceeds, then a separate equalization payment would be appropriate so as to ensure that both spouses end up with an equal division of those proceeds.[7]

Once the $5.011 million is properly divided between Cary and Jan through section 1101(g), the remaining community assets should be separately divided. (*Schleich*, at p. 287; Hogoboom, *supra*, at ¶ 8:617, p. 244.) However, because the $5.011 million and the intertwined tax liability thereon were not separately divided from the community estate under section 1101(g), it is unclear how the remaining community estate would have been divided.

Additionally, it appears the trial court's Propertizer does not correctly account for all monies actually realized by Cary as part of his share of the MC sale proceeds. The Propertizer divides tax liability, court ordered distributions from the trust account, and a loan payoff that benefited Cary. When tax liability and distributions are subtracted from each party's $2.5 million share of the total MC sale proceeds, Cary is left with a positive balance of about $1.035 million and Jan is left with a positive balance of about $644,350. This calculation does not appear to take into consideration at least Cary's $1.037 million pre-July 2019 sale distribution.

Because it appears the trial court's Propertizer does not appropriately divide the $5.011 million in MC sale proceeds, and because it is unclear what the division of the community estate would be if the $5.011 million MC sale proceeds were divided separately through application of section 1101(g), the court's division of community property is infirm. Under these circumstances, it is appropriate to vacate the court's community estate division and remand for a new division.

---

[7] Depending on the size of any overage, the trial court may either issue a separate order through section 1101(g) for one spouse to pay the other spouse the overage or may include the overage amount as part of the remaining community property division.

## 2. Applicability of Section 1101(h)

The trial court did not make an express finding with respect to malice or fraud. Because the court did not award 100 percent of any asset that was improperly disclosed by Cary, and made no express finding that Cary acted either maliciously or fraudulently, we presume the court determined that clear and convincing evidence did not establish Cary's failure was malicious or fraudulent. (See *Diamond*, *supra*, 106 Cal.App.5th at pp. 566–567; *Schleich*, *supra*, 8 Cal.App.5th at p. 276.) Considering the FSD, it is Jan's burden to show the evidence compels a finding by clear and convincing evidence that Cary did in fact act with malice or fraud. (*Diamond*, at pp. 566–567.) Jan has not met her burden.

### a. Life Insurance

The trial court's findings regarding the life insurance policy were relatively sparse. The court merely found Cary failed to disclose or provide notice to Jan before liquidating the policy and placing the funds into his bank account. While the finding supports a violation of section 1101(g), it does not alone compel a finding that Cary liquidated the policy maliciously or fraudulently. Further, although not mentioned as part of the court's findings, Cary testified during trial that he had no recollection of liquidating the policy or depositing the proceeds into his bank account. Failing to recall any actions regarding the liquidation does not affirmatively demonstrate malice or fraud.

Jan argues that Cary's testimony was not credible because, in order to answer her interrogatory about the deposit of $100,000 (which appeared to be the funds from the liquidated insurance policy), Cary was obligated to research and answer truthfully. Despite this obligation, Jan contends Cary gave a false answer that attributed the $100,000 to a dividend distribution from MC.

We agree with Jan that Cary's interrogatory answer attributed the $100,000 to a distribution from MC. However, Cary's response was qualified. Specifically, Cary answered in relevant part: "To the best of my recollection, based on timing and amount,

the deposit of $100,000 into my personal account … on January 10, 2019, derived from distributions I received from [MC]." While the trial court could have viewed this interrogatory answer as deceitful, it was not required to do so. (*Boswell*, *supra*, 225 Cal.App.4th at p. 1175.) The answer leaves open the possibility that it may be false, though not intentionally so, because Cary is responding to the best of his belief at that time. It was well within the court's prerogative to view Cary's answer in this manner and to reconcile that answer with Cary's trial testimony. (*Diamond*, *supra*, 106 Cal.App.5th at p. 567; *Boswell*, at p. 1175; see also *Schleich*, *supra*, 8 Cal.App.5th at p. 276.) Specifically, the court could believe that Cary actually did not remember his actions regarding the policy liquidation *during trial* and that Cary's answer to the interrogatory was based on his belief and recollection *at that time*. Under such a view of the evidence, no malice or fraud would be present, and no finding of malice or fraud would be compelled. This is how we view the court's order and the evidence. (See *Diamond*, at pp. 566–567; *Schleich*, at p. 276; see also *Boswell*, at p. 1175.)

Accordingly, Jan has not shown the evidence compels the conclusion by clear and convincing evidence that Cary acted fraudulently or maliciously when he failed to disclose his liquidation of the insurance policy. (See *Diamond*, *supra*, 106 Cal.App.5th at pp. 566–567.)

### b. MC Sale

No party disputes the adequacy of the trial court's finding that Cary's failure to disclose the MC sale breached a fiduciary duty owed to Jan. The findings reveal an inconsistency between the time Cary knew of the likely sale and the time he made his judicial disclosures. Further, the court found that but for Jan's fortuitous discovery of the MC sale from a third party, there was no evidence that Cary would have ever disclosed the sale. Admittedly, this particular finding suggests malice or fraud. Nevertheless, Cary was asked during trial about the pre-July 2019 discussions and negotiations that were occurring between MC board members regarding the sale of MC. Cary expressly

confirmed that the discussions and negotiations were confidential. When asked about his understanding of his "ability to disclose anything in relation to the negotiations regarding a sale between [MC] and [the buyer]," Cary responded, "I couldn't disclose anything outside of those two entities, [the buyer] and [MC]." Cary's testimony can be viewed as demonstrating that he subjectively believed that he was unable to disclose anything relating to the sale or potential sale of MC due to confidentiality obligations.[8] If Cary believed he was under an affirmative obligation of confidentiality that prevented disclosure, although mistaken, his actions would not have been done for the purpose of harming Jan or depriving her of her share of the sale proceeds; his actions would have been done for the purpose of complying with confidentiality obligations. Under this view of the evidence, the court could have believed Cary and concluded that he did not act fraudulently or maliciously. This is how we view the court's order and the evidence. (See *Diamond*, *supra*, 106 Cal.App.5th at pp. 566–567; *Schleich*, *supra*, 8 Cal.App.5th at p. 276; *Boswell*, *supra*, 225 Cal.App.5th at p. 1175.)

Jan argues that Cary's refusal to timely produce the sale documents demonstrates fraud and malice. However, the court did not find that Cary's conduct during discovery breached his fiduciary duties; rather, the court clearly stated that Cary breached his

---

[8]     Prior to the above quoted response, Cary was asked about discussions regarding "liquidating [MC's] assets." Cary testified that such discussions occurred in 2019, but not 2018. Cary was then asked about talks regarding a "potential sale" to the buyer and whether those talks were confidential. After responding that the talks were confidential, Cary was asked and answered the question quoted above. Given the generalized question about liquidation, and the specific question about a potential sale to the actual buyer, it is not clear that "liquidating [MC's] assets" is the same as negotiating the "potential sale" of MC to the buyer. Moreover, Cary was clear that his understanding regarding the "potential sale" to the buyer was confidential. Because the initial documents regarding a potential sale of MC were signed in February 2018, the record can reasonably be read as demonstrating that Cary believed all discussions and negotiations with the buyer regarding the sale of MC were confidential and thus, he was unable to make disclosures. (See *Eli B.*, *supra*, 73 Cal.App.5th at p. 1069; *Winograd*, *supra*, 68 Cal.App.4th at p. 631.)

fiduciary duty by failing to inform Jan that the sale was going to occur. Because Cary's conduct with respect to the sale documents postdates the breach of fiduciary duty by months, that conduct does not per se establish Cary's motivation and intent in breaching his fiduciary duty.

Further, the court addressed Cary's argument regarding the sale documents. The court explained that Cary was arguing he did not intentionally cause any delays, and, in essence, he did not control the release of the documents. The court did not elaborate on this argument or make an express finding that the argument was accurate. Importantly, the court also did not find that Cary's argument was incredible, unworthy of belief, or false. In the absence of findings to the contrary, and given that the court did not find malice or fraud, we read the FSD as implicitly finding that Cary did not engage in intentional conduct in an effort to delay discovery or the production of the sale documents.[9] (See *In re Marriage of Arceneaux*, *supra*, 51 Cal.3d at p. 1134; *Diamond*, *supra*, 106 Cal.App.5th at pp. 566–567; *In re Marriage of Furie*, *supra*, 16 Cal.App.5th at p. 827; *Schleich*, *supra*, 8 Cal.App.5th at p. 276.) Given these considerations, we cannot conclude that Cary's conduct with respect to the delayed production of MC sale documents compels a finding by clear and convincing evidence that Cary maliciously or fraudulently failed to disclose the MC sale. (See *Diamond*, *supra*, 106 Cal.App.5th at

---

[9] We recognize that Cary testified that he intentionally withheld the MC sale documents, but he then produced the documents. However, Cary also testified that he had lost his copy of the MC sale documents in the course of professional and private moves. When he eventually found the documents, he immediately gave them to his attorney so that they could be produced. Further, as noted above, Cary testified that he believed all things relating to the sale of MC were confidential. The court could have reasonably believed that Cary initially did not produce documents because of his mistaken belief regarding confidentiality and later due to his inability to locate the sale documents in his possession. So viewing the evidence, Cary's actions would not have been for the purpose of harming Jan or depriving Jan of property. (See *Diamond*, *supra*, 106 Cal.App.5th at pp. 566–567; *Schleich*, *supra*, 8 Cal.App.5th at p. 276; *Boswell*, *supra*, 225 Cal.App.5th at p. 1175.)

pp. 566–567; *Schleich*, *supra*, 8 Cal.App.5th at p. 276; *Boswell*, *supra*, 225 Cal.App.5th at p. 1175.)

Jan also argues Cary tried to hide the fact that he had received the $1.037 million pre-sale distribution by trying to convince Jan and Hubbell that it was the $1 million non-compete payment received in July 2019. Jan also points out that Cary spent significant sums of the $1.037 million on travel and leisure items and had the money deposited into his own bank account. However, Cary's actions toward the $1.037 million do not involve his actual breach of fiduciary duty. Again, the breach of fiduciary duty found by the trial court was not Cary failing to disclose that he had received a $1.037 million pre-sale distribution, nor was it Cary spending significant sums from that distribution or failing to provide full information to his accountant. The breach of fiduciary duty was the failure to properly disclose in February 2018 that the sale of MC would be occurring, and this breach occurred months before Cary received the $1.037 million in 2019. Because Cary's actions with respect to the $1.037 million post-date the actual breach of fiduciary duty found by the court, his actions do not per se establish his motive or intention for failing to disclose the sale.

Additionally, it is true the court accepted Cary's admission that he spent some of the $1.037 million like " 'a kid in a candy store.' " However, the court did not expressly conclude that Cary spent all of the $1.037 million in this way. While Cary's credit card statements clearly reflect that he was spending significant sums on things such as designer clothing, travel, and antiques/collectibles, the credit card bills before us do not total $1.037 million, or anything close to that amount.[10]

Further, Cary testified that significant sums from the 2019 MC sale distribution were spent maintaining community assets or supporting Jan and the children, including

---

[10]    Cary's credit card statements for 2019 that are part of the appellate record total about $136,000.

paying mortgage and living expenses (about $50,000), putting money into medical entities (other than MC) in which Cary's ownership interests were community assets ($270,000), paying credit cards used by Cary and Jan ($320,000), and paying spousal support ($20,000).

While the court was clearly not pleased that Cary dissipated a significant portion of the $1.037 million, the court did not expressly address these specific expenditures or find that all of Cary's expenditures were improper. Given the significant sums Cary expended on non-frivolous matters, the court could have reasonably viewed Cary's testimony as demonstrating that he was not trying to harm Jan. (See *Schleich*, *supra*, 8 Cal.App.5th at p. 276; *Boswell*, *supra*, 225 Cal.App.4th at p. 1175.) Accordingly, we cannot conclude that Cary's actions with respect to the $1.037 million compels a finding by clear and convincing evidence that Cary maliciously or fraudulently failed to timely disclose the sale of MC in February 2018.

In sum, Jan has not shown the evidence compels the conclusion that, by clear and convincing evidence, Cary acted fraudulently or maliciously under section 1101(h) when he failed to disclose the MC sale. (See *Diamond*, *supra*, 106 Cal.App.5th at pp. 566– 567.)

## II.     Attorneys' Fees as Remedies or Sanctions

### A.     Parties' Arguments

#### 1.     Jan's Contentions

Jan contends the trial court erred by failing to award her adequate attorneys' fees under three theories.

First, Jan argues that attorneys' fees are mandatory under section 1101(g), yet the court awarded her only a "smidgeon" of the fees she incurred relating to Cary's breaches of fiduciary duty. Further, Jan argues that, in order to reduce the fee award, the court improperly relied on a $17,000 discovery sanction and the false conclusion that she had unclean hands during settlement. Jan argues this is contrary to law as section 1101(g) has

no exceptions and that the court was obligated to award her the entirety of her fees incurred—$861,915.

Second, Jan argues the trial court erroneously failed to award any sanctions under section 2107. Jan argues that section 2107, subdivision (c) provides that courts shall award a sanction, including attorneys' fees, for the failure to make mandatory disclosures. Jan contends the court's failure is reversible error.

Third, Jan argues the trial court abused its discretion by failing to award any attorneys' fees as sanctions under section 271. Jan contends the record is replete with numerous instances of discovery misconduct and breaches of duty by Cary that necessitated many motions to compel, numerous attempts at meeting and conferring, and even the dismissal of Braun and the retention of Tonks at her own expense. Jan also argues that Cary unreasonably thwarted settlement attempts by not giving her sufficient information and time to settle the matter early and by later falsely testifying that terms appearing in a proposed stipulated judgment and a separate final settlement agreement were not agreed to, when in fact all terms were agreed. Jan also argues the court improperly relied on one discovery sanction of about $17,000 against Cary as a ground for denying section 271 sanctions.

For these collective reasons, and through these statutory bases, Jan contends the trial court erred by failing to award her $861,915 in attorneys' fees and expert costs.

### 2. Cary's Contentions

Cary contends the trial court did not abuse its discretion. Cary argues the $100,000 award for breaches of fiduciary duty is a significant punishment that reasonably addressed his misconduct. Cary also argues the court's findings demonstrate that section 271 sanctions are not appropriate and that it was Jan's conduct that unnecessarily prolonged litigation. Cary particularly notes that Jan unreasonably expected an award of $3 million as breach of fiduciary duty damages, about $3 million of the remaining MC sale proceeds, no tax liability, and $24,000 or $25,000 per month in spousal support.

31.

### B.    Additional Background

In concluding its discussion on breaches of fiduciary duty, the trial court explained:  "Remedies for breach of the fiduciary duty by one spouse include an award of attorney's fees and costs.  Given the Court's findings on the breaches of fiduciary duty committed by [Cary], the Court will award [to Jan] attorney's fees and costs in the amount of $100,000."  The court did not explain how it arrived at the $100,000 figure or cite a particular statutory basis for the figure.

The trial court also addressed Jan's request for attorneys' fees under section 271.  In rejecting the request, the court explained:

> "Here, [Jan] seeks an award of sanctions under section 271.  [Jan's] request for sanctions is based on her allegations that [Cary] continually frustrated the settlement process and deliberately obstructed discovery, requiring [Jan] to bring repeated motions.

> "With respect to the settlement process that has occurred in this case, it does not appear to the Court that the actions of [Cary] are solely responsible for the inability of the parties to reach a resolution.

> "The first attempt at a settlement initiated by [Cary] in 2017 was met with a lack of response to his request for a number that would settle the case.  The second attempt at settlement, again initiated by [Cary] when he was self-represented, collapsed when the agreement presented to him at court failed to match the written term sheet both parties had agreed to.  That term sheet essentially provided that [Jan] would receive all the funds remaining from the sale of [MC] in the blocked account and would be responsible for payment of any tax obligations related to that money.  The agreement presented to [Cary] would have required him to be responsible for the taxes while [Jan] received all the blocked account funds.  [Citation.] This was a significant change in the terms that caused [Cary] to refuse to sign the agreement.

> "The parties participated in a third settlement conference in January 2022, at which an agreement in concept was reached.  This agreement provided that the tax liability would be paid from the blocked account, [Cary] would receive $66,000 to pay any unsecured creditors and [Jan] would receive the balance of the blocked account funds.  [Cary] had indicated at the settlement conference that if he could not satisfy the

unsecured creditors he may still need to file for bankruptcy. [Jan's] counsel provided a settlement agreement based on the terms reached at the conference but included a provision that precluded [Cary] from filing bankruptcy for five year[s]. Given the significant change in terms, [Cary] did not sign the agreement. There were also issues with the proposed agreement regarding terms related to [Cary's] business partner that were unacceptable.

"The evidence does not support sanctions against [Cary] under section 271.

"With respect to the obstruction of the discovery process, the court has already sanctioned [Cary] $16,828.61. The Court finds that no additional sanctions are warranted for the discovery issues between the parties."

## C.      Legal Standards

Section 271 authorizes the court to impose "attorney's fees and costs" against a party who engages in "conduct [that] frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." (§ 271, subd. (a); *In re Marriage of Hoch* (2026) 119 Cal.App.5th 80, 95.) Because attorneys' fees under section 271 are a sanction for violating the important public policy of curbing obstreperous litigation and encouraging both cooperation between litigants and settlement in family law matters, courts consider the sanctioned party's conduct during the litigation and may impose the sanction irrespective of any actual injury to or financial need of the non-sanctioned party. (See § 271, subd. (a); *Hoch*, at p. 95; *In re Marriage of Rangell* (2023) 95 Cal.App.5th 1206, 1218–1219 (*Rangell*); *Sagonowsky v. Kekoa* (2016) 6 Cal.App.5th 1142, 1152 (*Sagonowsky*).) However, the amount of attorneys' fees and costs imposed is based on the extent that the sanctioned party's improper conduct caused the non-sanctioned party to incur attorneys' fees and costs. (*Sagonowsky*, at pp. 1152, 1156–1157; *In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1318 (*Tharp*).)

Further, attorneys' fees awarded as a sanction cannot impose an unreasonable financial burden on the sanctioned party. (§ 271, subd. (a); *Rangell*, at p. 1219.)

A trial court's decision to either grant or deny attorneys' fees and costs as a sanction under section 271 is reviewed for an abuse of discretion. (*In re Marriage of Hoch*, *supra*, 119 Cal.App.5th at p. 95; *Tharp*, *supra*, 188 Cal.App.4th at p. 1316.) Among other ways, a court abuses its discretion if, "considering all the evidence viewed most favorably in support of the order and indulging all reasonable inferences in its favor, no judge could reasonably make the order." (*Rangell*, *supra*, 95 Cal.App.5th at p. 1218; *Sagonowsky*, *supra*, 6 Cal.App.5th at p. 1152.) The findings of fact that formed the basis for the trial court's section 271 decisions are reviewed under the substantial evidence standard of review. (*Rangell*, at p. 1218; *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 995.) Appellate courts view the evidence most favorably to the court's order and indulge all reasonable inferences in support of the court's order. (*In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 652 (*Sorge*); see also *In re Marriage of Nelson* (2025) 115 Cal.App.5th 904, 914 (*Nelson*).) Appellate courts do not reweigh the trial court's credibility determinations. (*Nelson*, at p. 914; *Boswell*, *supra*, 225 Cal.App.4th at p. 1175.) Finally, under the doctrine of implied findings, appellate courts infer the trial court made every factual finding necessary to support its decision. (*In re Marriage of Destiny & Justin C.* (2023) 87 Cal.App.5th 763, 769 (*Destiny*).)

### D. Analysis

#### 1. Mandatory Attorneys' Fees Under Section 1101(g)

Because the trial court concluded Cary breached his fiduciary duty to Jan by failing to timely disclose the sale of MC, section 1101(g) required the trial court to award Jan attorneys' fees. (§ 1101(g); *In re Hokanson*, *supra*, 68 Cal.App.4th at pp. 992–993.) The court did not identify the statutory basis for awarding Jan $100,000 in attorneys' fees and costs. However, because section 1101(g) was applicable and argued by the parties before the trial court, and we resolve ambiguities in a manner that supports the judgment

(*Jones*, *supra*, 99 Cal.App.5th at p. 1191; *Eli B.*, *supra*, 73 Cal.App.5th at p. 1069), we read the FSD as awarding Jan $100,000 in attorneys' fees pursuant to section 1101(g).

Jan argues the court erred by not awarding her a "significant portion" of her full $861,915 in attorneys' fees and expert costs. Jan's opening brief does not define what she means by a "significant portion." In the absence of a specific number, we limit our discussion to the request for $861,915. With this understanding, we cannot agree with Jan.

The $861,915 requested is the amount Jan's attorneys and expert generated to prosecute the entire marital dissolution. However, the attorneys' fees and costs available under section 1101(g) are for fees and costs generated due to a spouse's breach of fiduciary duties.[11] (*In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 348 ["The trial court erred when it denied any award [under section 1101(g)] to Edward for attorney fees *attributable to Sandra's violation of section 721*." (Italics added.)].) We are aware of no authority, and Jan cites none, in which attorneys' fees and expert costs for an entire dissolution dispute, and not just fees and costs associated with a breach of fiduciary duty, have been awarded under section 1101(g). To hold otherwise would untether section 1101(g)'s remedy from the specific conduct it prohibits and seeks to correct. It would also lead to absurd results when an undisclosed community asset has a small value, yet the dissolution proceedings as a whole are lengthy and involve substantial fees. We cannot condone such a practice and thus, will not read section 1101(g) as authorizing an award of attorneys' fees for the entire prosecution of a marital dissolution. Accordingly,

---

[11] In this respect, it does not appear that any of Tonks's $168,000 in expert costs can be reasonably attributed to Cary's failure to timely disclose the MC sale. Tonks was retained by Jan in March 2021, which is after she received the MC sale documents in July 2020.

the trial court did not err by declining to award Jan $861,915 under section 1101(g).[12]
(*Fossum*, at p. 348.)

### 2. Attorneys' Fees as a Sanction Under Section 271

The trial court declined to award Jan attorneys' fees under section 271 for two basic reasons:  Cary was not responsible for the case not settling and Cary had been sanctioned for his discovery conduct.  Jan disputes both grounds, but we detect no abuse of discretion.  (*Rangell*, *supra*, 95 Cal.App.5th at p. 1218.)

### a. Settlement

As quoted above, the trial court found Cary was not "solely responsible" for the failure to settle.  In support of this finding, the court discussed three settlement attempts between December 2017 and January 2022 that were unsuccessful.  Specifically, the court found that Cary:  attempted a settlement in December 2017 that was met with no response by Jan; attempted a second settlement in May 2021 that failed when the terms of a stipulated judgment prepared by Jan did not match the terms written down during settlement negotiations; and attempted a third settlement in January 2022 that failed

---

[12]    We note that although Jan argues more than $100,000 in fees and costs were generated, she merely cites to a description in her opening brief of discovery actions; she does not provide a specific fee figure supported by evidence.  (Cf. *City of Fresno v. Superior Court* (2026) 119 Cal.App.5th 418, 437, fn. 10 [noting that appellate courts "do not comb the record in search of citations to support a party's case"].)  As a result, Jan does not adequately show either that the $100,000 award was erroneous or what amount should have been awarded under section 1101(g).  We further note, however, that the last discovery motion regarding production of the MC sale documents was filed by Jan in May 2020.  In that motion, Jan requested $75,000 as a sanction under section 271.  Because section 271 authorizes the award of attorneys' fees as a sanction, the motion indicates that, up to the May 2020 motion, Jan had incurred $75,000 in attorneys' fees to get the MC sale documents.  Further, in connection with Cary's withdrawal of funds from a 401(k) account, Jan moved in March 2023 for $8,234 in attorneys' fees as a sanction. The $100,000 fee award is sufficient to cover both the $75,000 in fees generated by the failure to timely disclose the MC sale and the $8,234 in fees related to the 401(k) withdrawal; approximately $17,000 is leftover to cover fees related to Cary's liquidation of the insurance policy.

because a third party objected to some of the terms and when an unagreed provision relating to Cary was added to the formal settlement. These findings constitute substantial evidence that Cary made good faith attempts to settle the case throughout the litigation and thus, should not be sanctioned under section 271. (*Nelson*, *supra*, 115 Cal.App.5th at p. 914; *Sorge*, *supra*, 202 Cal.App.4th at p. 652.) Jan disputes the accuracy of these findings.

### i) First Settlement – December 2017

Relying on her trial testimony, Jan contends that she met with Hubbell at Cary's request, considered the information Cary provided, but determined she did not have sufficient information to accept the $400,000 offer. Without adequate information, Jan argues it was unreasonable for Cary to try to pressure her to either accept $400,000 or provide a different settlement amount.

Jan's testimony notwithstanding, Jan no longer had and did not produce the document with the $400,000 offer, and Hubbell had no recollection of meeting with Jan. Moreover, Cary testified he did not give Jan a paper with a $400,000 settlement offer, but instead told her about an unprecedented bonus from MC and asked her to make him an offer. Cary testified he approached Jan in order to avoid protracted litigation and to avoid racking up legal and accounting fees. As the trier of fact, the court was entitled to credit Cary's (and Hubbell's) testimony and disbelieve Jan. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 (*Schmidt*); *Boswell*, *supra*, 225 Cal.App.4th at p. 1175.) The court's acceptance of Cary's testimony would mean that Cary was attempting to open up communication channels for settlement and to avoid prolonged litigation, but Jan did not meaningfully reciprocate. (*Nelson*, *supra*, 115 Cal.App.5th at p. 914; *Sorge*, *supra*, 202 Cal.App.4th at p. 652.)

### ii) Second Settlement – May 2021

Jan argues there was no change in terms, rather there was a typographical error that appeared in the negotiated term sheet that was corrected in a proposed stipulated

judgment. Specifically, Jan explains the term sheet erroneously stated that she would pay taxes on the MC sale proceeds, while the stipulated judgment correctly stated that Cary would pay all tax liability.

A review of the two documents demonstrates the terms were changed. The term sheet in relevant part provided: "Respondent [that is, Jan] assumes all responsibilities for any and all credit cards in the name of the parties and any and all IRS and FTB tax obligations, pre and post separation." In contrast, the proposed stipulated judgment provided in relevant part: "Petitioner [that is, Cary] will indemnify and hold harmless Respondent [Jan] from any and all of these debts: a. Various credit cards in either Petitioner's or both parties' names[; and] b. IRS and FTB tax obligations, pre and post separation." As can be seen, all credit card and tax liability went to Jan in the term sheet, but went to Cary in the proposed stipulated judgment.

Cary's testimony confirmed the change. Cary testified the term sheet and stipulated judgment differed in their treatment of community tax liability and debt and that this was unacceptable. When asked whether the change was merely correcting a mistake on the term sheet, Cary responded that the stipulated judgment was not correcting a mistake. Cary also testified there were no discussions during settlement negotiations about him assuming all debt and tax liability. Cary testified he could not go forward with the settlement because this was a negative material change in terms. Cary also testified that he told Jan's counsel during this settlement that if he did not have his taxes paid and money for unsecured creditors, he would have to file bankruptcy. Consistent with this testimony, but while testifying about the third settlement attempt, Cary also testified that his "goal … in all settlement discussions" was to have his tax liability paid off. Also regarding the third settlement, Welsh's testimony further confirmed that Cary's "two primary goals" during the third settlement was first to ensure his tax liability would be paid, and second that he would have sufficient funds to pay his unsecured creditors and thus, be able to avoid bankruptcy. As the trier of fact, the trial

court was entitled to credit and believe all of this testimony (*Schmidt*, *supra*, 44 Cal.App.5th at p. 582; *Boswell*, 225 Cal.App.4th at p. 1175), which it clearly did, and conclude that Cary never agreed to assume all tax liability.

Additionally, when the terms of the term sheet and the stipulated judgment are compared, they appear to be very advantageous to Jan in terms of the distribution of liquid assets, including the remaining MC sale proceeds. While Cary would be given several bank accounts worth about $11,000 and about $335,000 from a 401(k) account, Jan would receive about $3 million in various bank accounts and $350,000 from the same 401(k) account.

Given these considerations, the trial court could conclude that Cary was willing to give Jan significant assets, as long as his tax liability was taken care of. The term sheet and the stipulated judgment provided Jan with the same substantial assets; but while the term sheet met Cary's primary goal of taking care of his tax liability, the stipulated judgment squarely did not. The court was entitled to accept Cary's testimony (and Welsh's consistent testimony) and conclude that Jan overreached and derailed a favorable settlement by insisting on a term that was not part of the negotiations. (*Nelson*, *supra*, 115 Cal.App.5th at p. 914; *Destiny*, *supra*, 87 Cal.App.5th at p. 769; *Boswell*, *supra*, 225 Cal.App.4th at p. 1175.) Under such circumstances, the court could reasonably conclude that Cary was not the primary reason for the collapse of the second settlement attempt.

### iii)    Third Settlement – 2022

Jan argues that her counsel received a letter from Welsh that rejected the final terms of the third settlement. In that letter, Jan points out that there is no mention of the five-year prohibition against Cary filing for bankruptcy. Jan's point is correct, but it does not undermine the trial court's findings.

First, Welsh was not under an obligation to identify every aspect of the settlement that was unacceptable. Second, substantial evidence supports the trial court's findings that Cary did not agree to a five-year bankruptcy prohibition. Cary expressly testified

there was never an agreement that he would have to wait five years before filing for bankruptcy. Further, Welsh did not testify that a five-year bankruptcy prohibition had been agreed. Instead, Welsh testified that a five-year bankruptcy prohibition was discussed, but it was made clear that unless Cary was left with sufficient money to satisfy unsecured creditors, he would have to file for bankruptcy. In other words, Welsh testified that, although *discussed*, the bankruptcy prohibition was not *agreed*. As the trier of fact, the trial court was entitled to credit this testimony. (*Schmidt*, *supra*, 44 Cal.App.5th at p. 582; *Boswell*, *supra*, 225 Cal.App.4th at p. 1175.) Accordingly, irrespective of the failure of Welsh's letter to mention the bankruptcy prohibition, substantial evidence supports the court's conclusion that the unagreed bankruptcy prohibition was inserted into the settlement, and that the insertion of that term was alone sufficient to collapse the settlement.[13] (*Nelson*, *supra*, 115 Cal.App.5th at p. 914; *Destiny supra*, 87 Cal.App.5th at p. 769; *Boswell*, at p. 1175.)

### b. Discovery

We agree that Cary's discovery conduct was not a model of cooperation. However, we are not satisfied that Jan has shown that the trial court abused its discretion by failing to award her section 271 sanctions.

First, Jan sought $861,915 in fees and costs as a sanction under section 271. Again, this was the entire amount of fees and costs generated by Jan's legal team. Jan has not provided a figure that specifically accounts for only discovery costs associated with obstreperous conduct. This is a fatal defect because the amount of attorneys' fees and costs imposed under section 271 is based on the extent that the sanctioned party's

---

[13] We are aware that there were other provisions of the settlement agreement that affected Dr. Walker and that caused her to reject the settlement. However, that Dr. Walker independently did not ascent to the settlement does not undermine the fact that the settlement would have collapsed apart from those terms due to the insertion of the bankruptcy prohibition. Moreover, Cary testified that it was Jan who insisted that Dr. Walker was part of the settlement process.

improper conduct caused the non-sanctioned party to incur attorneys' fees and costs. (*Sagonowsky*, *supra*, 6 Cal.App.5th at pp. 1152, 1156–1157; *Tharp*, *supra*, 188 Cal.App.4th at p. 1318.)  Clearly included in the requested fees are charges that had absolutely nothing to do with discovery (trial, for example).  Because not all of the fees requested by Jan related to discovery misconduct, the court properly declined to award Jan the entire $861,915 of requested fees and costs.  (*Sagonowsky*, *supra*, 6 Cal.App.5th at pp. 1152, 1156–1157; *Tharp*, *supra*, 188 Cal.App.4th at p. 1318.)

Second, Jan acknowledges that she received sanctions of approximately $17,000 in November 2022 for discovery misconduct.  The record also shows that she was awarded a discovery sanction of $960 on September 23, 2019.  Further, the court awarded Jan $100,000 in attorneys' fees in the FSD pursuant to section 1101(g).  Prior to discussing sanctions under section 271, the court found Cary breached his fiduciary duty by cashing out an insurance policy without notice, by failing to timely disclose the MC sale, and by withdrawing funds from a 401(k) account.  For all of these breaches of fiduciary duty, Jan was awarded $100,000 in attorneys' fees.  As Jan's brief explains, the discovery, motions, and associated fees generated as a result of Cary failing to timely disclose the MC sale were particularly substantial, and these discovery related fees were included within the court's section 1101(g) fee award.  Indeed, in the last discovery motion related to the MC sale documents, Jan requested $75,000 in attorneys' fees under section 271.  Because Jan has already been compensated and awarded her attorneys' fees for a large portion of Cary's discovery related conduct, and because Jan did not identify a specific figure relating only to fees associated with obstreperous discovery conduct, the court did not abuse its discretion by denying further sanctions under section 271 and avoiding the possibility of making double awards of attorneys' fees.[14]  (*Rangell*, *supra*,

---

[14]     We recognize that the FSD declined to award sanctions under section 271 for discovery misconduct because Cary had already been sanctioned for that misconduct and did not believe that further sanctions were warranted.  The FSD particularly highlighted

95 Cal.App.5th at p. 1218; cf. *Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1159 ["Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited."].)

Third, with respect to Cary's conduct towards Braun, the trial court made no findings. Instead, the court generally mentioned the approximately $17,000 that had been previously awarded for obstruction of the discovery process and that no further sanctions were warranted. We read this finding in part to mean that no other conduct regarding discovery was sufficiently obstreperous to warrant fees as a sanction under section 271. (*Nelson*, *supra*, 115 Cal.App.5th at p. 914; *Eli B.*, *supra*, 73 Cal.App.5th at p. 1069; *Sorge*, *supra*, 202 Cal.App.4th at p. 652.) Based on Jan's briefing, it appears that Braun was frustrated with Cary's failure to pay and failure to provide information. However, even if Braun was frustrated, it does not appear he resigned, and he was paid at least $50,000 ($25,000 from Jan and $25,000 from Cary) by virtue of a court order. Further, while Braun may have been frustrated with Cary, there are no findings regarding Cary's culpability or the reasons why some requested information either was not produced or not timely produced, and Cary was not previously sanctioned for this conduct. In the absence of findings to the contrary, the court could have reasonably concluded that Cary's

_____

the $17,000 attorneys' fees sanction for Cary's discovery misconduct. As Jan rightly points out, this amount of sanctions involved only one request for production that was served in October 2021 and would not involve any conduct that pre-dated October 2021. However, it is possible to read the FSD as showing that the court did not intend to make a double award of attorneys' fees based on conduct that had already been sanctioned. In this respect, the $100,000 of attorneys' fees awarded under section 1101(g) covered discovery misconduct in March 2023 and from approximately April 2019 through July 2020, but not October 2021. Given the court's desire to not make a double award of attorneys' fees, we read the FSD as including the $100,000 awarded under section 1101(g) as part of its conclusion that Cary had already been sufficiently sanctioned for discovery misconduct and that no further sanctions were warranted; we do not read the court's order as declining to award attorneys' fees under section 271 solely because Cary had been previously sanctioned $17,000 for discovery misconduct. (*Jones*, *supra*, 99 Cal.App.5th at p. 1191; *Eli B.*, *supra*, 73 Cal.App.5th at p. 1069.)

conduct towards Braun, while frustrating, was not so severe that it rose to the level of sanctionable obstreperous conduct under section 271.  (*Nelson*, at p. 914; *Destiny*, *supra*, 87 Cal.App.5th at p. 769.)  Jan has not met her burden of demonstrating that the court abused its discretion by declining to award fees under section 271 for Cary's conduct towards Braun.  (*Rangell*, *supra*, 95 Cal.App.5th at p. 1218.)

In sum, Jan has failed to show that, while viewing the evidence in the light most favorable to the FSD, no reasonable judge would have failed to award sanctions under section 271.  (*Rangell*, *supra*, 95 Cal.App.5th at p. 1218.)

### 3.　　Sanctions Under Section 2107

Jan argues that section 2107, subdivision (c) mandates an award of sanctions, including attorneys' fees, against Cary for his failure to follow mandatory disclosure requirements.  However, Jan did not request a sanction under section 2107, subdivision (c) in either her trial brief, closing trial brief, or objections to the court's proposed judgment, nor does the record reflect that she filed a motion for sanctions under section 2107, subdivision (c) prior to trial.  Because she did not seek sanctions under section 2107 in the trial court, she has forfeited the issue on appeal.  (See *Westsiders Opposed to Overdevelopment v. City of Los Angeles* (2018) 27 Cal.App.5th 1079, 1091; *In re Marriage of Eben-King & King* (2000) 80 Cal.App.4th 92, 117.)

Alternatively, sanctions under section 2107, subdivision (c) must include both a monetary award in an amount sufficient to deter future violations and attorneys' fees, unless the court finds substantial justification for the failure or other circumstances that make the sanction unjust.  (§ 2107, subd. (c); *Schleich*, *supra*, 8 Cal.App.5th at p. 296.)  As explained above, the trial court found that Cary breached fiduciary duties by failing to disclose three "transactions" and then awarded attorneys' fees under section 1101(g) for those breaches/failures to disclose.  As a result, Jan has already received her attorneys' fees associated with Cary's disclosure failures.

### III. Need-Based Attorneys' Fees

#### A. Parties' Arguments

Jan contends the trial court erred by awarding her only $168,000 of her requested $861,915 in attorneys' fees. Jan argues this award covered only Tonks's fees, which means she was awarded nothing for her attorneys' fees. Jan argues that, considering Cary's misconduct, her need for fees, and the disparity in income, the award is contrary to other cases that have found insufficient need-based awards were an abuse of discretion.

Cary contends the trial court did not abuse its discretion by awarding $168,000 in attorneys' fees. Cary argues the trial court made findings that demonstrate Jan's litigation and demands were unreasonable and that they unnecessarily prolonged the case. Cary argues the fees generated from such conduct were not reasonably incurred and thus, not compensable under section 2030. Therefore, Cary avers the court properly declined to award further substantial sums of attorneys' fees.

#### B. Additional Background

In addressing need-based attorneys' fees under section 2030, the trial court found that there was a disparity of income between Cary and Jan and that the hourly rates charged by Jan's firm were reasonable. The court then addressed "[t]he more difficult issue" of the number of hours reasonably incurred:

> "First, the Court will decline to award fees for Lisa Holder [in the amount $7,500]. There is no declaration from Ms. Holder nor are there billing statements submitted by her. With respect to the claimed fees from Mr. Leon [of $19,036], there is no declaration from Mr. Leon concerning his experience, rate or hours expended; only a compilation of his charges. As there is no foundation for those charges, the Court declines to award fees for any work performed by Mr. Leon.
>
> "With respect to the work performed by counsel for [Jan], the Court will deduct $85,000 from the billing for time spent on the joinder action brought against [Cary's] business partner, Dr. Walker. The Court heard several days of testimony related to the request to join Dr. Walker and has

44.

determined that the joinder request was not reasonably necessary. [Jan] dismissed the request mid-way through the hearing.

"While the Court has determined [Cary] breached his fiduciary duty with respect to his failure to notify [Jan] concerning the sale of [MC] and his failure to provide documents associated with this sale unnecessarily prolonged these proceedings, it is clear much of the litigation after that time could have been avoided through negotiations that if not resolving the case would have limited the issues. It is also clear that the failed settlement negotiations discussed by the Court below were the result of changes in the agreements presented to [Cary] that were not negotiated and agreed to by [Cary]. While [Jan] seeks sanctions under section 271, in the Court's mind, [Cary's] actions were not the cause of the failure of the settlement efforts.

"All those things considered, the Court awards [Jan] the amount of $168,000 in attorney[s'] fees and costs, including experts retained by [Jan]."

## C.    Legal Standard

In order to ensure that both spouses have access to legal representation (*In re Marriage of Seaman & Mejou* (1991) 1 Cal.App.4th 1489, 1496–1497), and based on need, a spouse may obtain an order requiring the other spouse to pay for attorneys' fees during a marriage dissolution proceeding. (§§ 2030, subd. (a)(1), 2032; *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 111.) If the trial court's findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorneys' fees, even if the requesting party has resources to pay for their own legal fees. (See §§ 2030, subd. (a)(2), 2032, subd. (b); *In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1051.) However, the Family Code generally provides that "[i]f a court orders a party to pay attorney's fees or costs under this code, the court shall first determine that the party has or is reasonably likely to have the ability to pay." (§ 270.) In the specific context of dissolution of marriage, section 2030 provides that before a need-based attorneys' fee award is made, the trial court must consider the ability of the payee spouse to pay the attorneys' fees of both parties. (§ 2030, subd. (a)(2); *Ciprari*, at pp. 111–112; *Morton*, at pp. 1049–1050, 1053; *In re Marriage of Keech* (1999) 75 Cal.App.4th 860,

866–868.)  Further, an award of attorneys' fees must be "just and reasonable under the relative circumstances of the respective parties."  (§ 2032, subd. (a); *In re Marriage of Hearn* (2023) 94 Cal.App.5th 380, 393–394.)  In this regard, courts must take into consideration "the need for the award [of fees] to enable each party, to the extent practical, to have sufficient resources to present the party's case adequately," as well as considering the factors listed under section 4320, to the extent those factors may be relevant.  (§ 2032, subd. (b).)  The amount of fees awarded is limited to the amount that is "reasonably necessary" to maintain or defend a dissolution action.  (§ 2030, subd. (a)(1); *Hearn*, at p. 393.)  Fees may be "denied if a case has been overlitigated or if the fees otherwise were not 'reasonably necessary.' "  (*Ciprari*, at p. 112; see *Keech*, at pp. 870–871.)  An award of attorneys' fees is reviewed for an abuse of discretion, subject to the limitations imposed by sections 2030 and 2032 (*Morton*, at pp. 1049–1050; *Keech*, at pp. 866–867), while the findings that support the fee award are reviewed for substantial evidence.  (*Hearn*, at p. 394; *Ciprari*, at p. 112.)  Because trial courts enjoy broad discretion, an abuse of discretion may occur when, while viewing the evidence in the light most favorable to the court's order, no judge could have reasonably issued the fees awarded pursuant to section 2030.  (*In re Marriage of Bowman* (2026) 119 Cal.App.5th 922, 929.)

### D.     Discussion

Jan's request on appeal for the entirety of the $861,915 is improper.  As quoted above, the trial court declined to award the fees charged by attorneys' Holder and Leon.  The court also refused to award Jan fees for the aborted attempt to join Cary's business partner Dr. Walker as a party.  In total, the court denied these $111,536 in fees because they were either unreasonably incurred or insufficiently supported.  Jan does not argue that the court's findings with respect to the failed joinder or the fees of attorneys Holder and Leon were erroneous or insufficiently supported.  Therefore, at best, Jan could attempt to obtain $750,379 in this appeal.

We agree with Jan that an award of $168,000 when compared to $750,379 appears to be low (about a 22 percent award). However, the trial court's order does not explain how it arrived at the $168,000 figure, and Jan did not object that the finding was ambiguous, cite to section 2030, or request additional findings by the trial court for purposes of section 2030. Accordingly, we apply the doctrine of implied findings to review the court's award. (*Destiny*, *supra*, 87 Cal.App.5th at p. 769.)

Of the $750,379 that was not expressly disallowed by the trial court, a substantial sum of attorneys' fees related to discovery were separately awarded by the court. As discussed above, the two discovery sanctions and the fees awarded under section 1101(g) total about $118,000. When the $118,000 prior fee awards are considered, $632,379 of requested fees and costs remain.

Of the remaining $632,379, the court awarded Jan an additional $168,000 as a need-based fee. This reduces the amount of unaccounted for fees and costs to approximately $464,379.

Prior to trial, the court authorized distributions for attorneys' fees and costs to Jan. Specifically, the court authorized attorneys' fees distributions that totaled $150,000. The court could have concluded that Jan had no need for these fees because they were paid from community resources. (*Destiny*, *supra*, 87 Cal.App.5th at p. 769.) When subtracted from the unaccounted fees, $314,379 remain.

The trial court's order found Cary's conduct after production of the MC sale documents was not the reason the case failed to settle. The court faulted Jan for insisting on terms that were not actually agreed to during settlement negotiations and for at least not opening channels to settlement early in the litigation. We think also implicit in the court's findings is the conclusion that Jan was requesting unreasonable terms or amounts. As discussed above, the court could have faulted Jan for being unwilling to accept significant monetary concessions in exchange for accepting tax liability, or insisting on a bankruptcy prohibition in light of the significant debts owed by Cary. Further, Jan was

47.

requesting either $24,000 or $25,000 per month in permanent spousal support, or about $300,000 per year. These figures represent about 90 percent of Cary's $325,000 yearly salary. Jan's testimony also indicates she sought millions of dollars of assets but no tax liability. Such demands do not readily lend themselves to settlement. Given these considerations, the court could have concluded that the case was over-litigated or that the unaccounted for funds were not reasonably incurred. (*Destiny supra*, 87 Cal.App.5th at p. 769; *In re Marriage of Ciprari*, *supra*, 32 Cal.App.5th at p. 112; *In re Marriage of Keech*, *supra*, 75 Cal.App.4th at pp. 870–871.)

The trial court enjoys broad discretion in awarding fees under section 2030. (*In re Marriage of Bowman*, *supra*, 119 Cal.App.5th at p. 929.) In light of the attorneys' fees that were awarded prior to or following trial, the pre-trial distributions of community assets for the purpose of paying attorneys' fees, and the trial court's express and implied findings, we are not satisfied that the trial court's award of $168,000 under section 2030 was so unreasonable that no judge could have issued it. Therefore, Jan has not shown that the $168,000 fee award is an abuse of discretion. (*Ibid*.)

## CARY'S APPEAL

" 'Permanent spousal support "is governed by the statutory scheme set forth in sections 4300 through 4360." ' " (*In re Marriage of Deluca* (2020) 45 Cal.App.5th 184, 195.) Section 4330 directs the court to award spousal support in an amount, and for a period of time, that is just and reasonable, based on the marital standard of living and the considerations identified by section 4320. (§§ 4330, subd. (a), 4320; *In re Marriage of Maher & Strawn* (2021) 63 Cal.App.5th 356, 363.) Generally, permanent spousal support is " ' " 'determined by the financial circumstances of the parties after their dissolution and the division of their community property.' " ' " (*In re Marriage of Pletcher* (2021) 68 Cal.App.5th 906, 912; *In re Marriage of Wittgrove* (2004) 120 Cal.App.4th 1317, 1327.)

In this case, the trial court awarded permanent spousal support of $11,500 per month. Cary argues this was an abuse of discretion because the award represents 68 percent of his monthly income, which will not leave him with sufficient income to pay his own living expenses. In addressing Cary's objection that the amount of spousal support was too high, the court noted that Cary himself had suggested spousal support of $10,758 and that the difference between Cary's suggested amount and the amount awarded was only $742. Considering Cary's profession and his $325,000 annual salary, it is difficult to conclude that a difference of $742 between Cary's suggested amount and the court's award constitutes an abuse of discretion.

That being said, we have concluded that the court's Propertizer and division of community property are infirm because of how the court dealt with the proceeds from the MC sale. It is unclear what effect an appropriate treatment of the MC sale proceeds would have on the parties and on the ultimate division of community property. Further, because the Propertizer and division of community assets is infirm, the true financial condition of the parties is unclear. An accurate understanding of the parties' actual financial condition would influence several section 4320 factors, including: the ability of the supporting party to pay spousal support (taking into account that party's earning capacity, earned and unearned income, assets, and standard of living); the needs of each party based on the marital standard of living; the obligations and assets of the parties; immediate and specific tax consequence to each party; and the balance of hardships to each party. (§ 4320, subds. (c), (d), (e), (j), (k).) In light of the uncertainty caused by the treatment of the MC sale proceeds, and the fact that the court's spousal support award was based in part on an infirm division of community assets, it is appropriate to vacate the court's award of permanent spousal support. Once the MC sale proceeds are appropriately distributed through section 1101(g),[15] the remaining community assets

---

[15] The parties' briefing regarding section 1101(g) remedies focuses primarily on the MC sale proceeds. Because we are remanding this matter for a new division of the

appropriately divided, and the parties' respective financial conditions are reassessed, the court may set a new spousal support figure.[16]

## DISPOSITION

The trial court's award of permanent spousal support and its division of community assets, particularly its treatment of proceeds from the sale of MC and associated tax liability, are vacated. The judgment is otherwise affirmed. The matter is remanded to the trial court for proceedings consistent with this opinion. In the interest of justice, the parties will bear their own costs on appeal.

HARRELL, J.

WE CONCUR:

HILL, P. J.

DESANTOS, J.

---

community estate and section 1101(g) proceedings, the trial court may consider the $100,000 liquidated insurance policy and the $215,000 withdrawal from the 401(k) account and make any orders relating to those assets that may be appropriate under section 1101(g), consistent with this opinion.

[16] Nothing in this order precludes the trial court from again awarding $11,500 in monthly spousal support, provided that this figure is supported by substantial evidence.